

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-10-00475-CV

IN THE INTEREST OF C.S.L.E.H.
AND C.H.H., JR., CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellant C.H. Sr. (Father) appeals from the order terminating his parental rights to his children, C.S.L.E.H. and C.H.H. Jr.  We will affirm.

### II. FACTUAL AND PROCEDURAL BACKGROUND

Father is the alleged biological father of C.S.L.E.H. and C.H.H. Jr. C.S.L.E.H. was born in April 2005, and C.H.H. Jr. was born in July 2007.  Both children tested positive for cocaine at birth.

----

[1]*See* Tex. R. App. P. 47.4.

The children's biological mother, T.A., admitted to using drugs during her pregnancies and to having a long history of drug abuse. She was unable to rehabilitate and maintain sobriety, so the trial court terminated her parental rights in December 2008. The court declined to terminate Father's rights at that time.

Prior to her rights being terminated, T.A. primarily cared for the children. Although Father did not live with the children, he saw them regularly before Appellee Texas Department of Family Protective Services' (TDFPS) Child Protective Services (CPS) unit removed the children and placed them in a foster home in November 2007. Father was involved with T.A. for a number of years and was "vaguely" aware of her drug abuse before CPS removed the children.

CPS caseworker Penny Smith received a referral related to C.H.H. Jr.'s birth in July 2007. In an attempt to avoid removal and foster care, Smith placed the children with T.A.'s oldest daughter as part of a safety plan. Smith said that CPS did not place the children with Father because he never responded to her attempts to contact him and because he was previously convicted of aggravated possession of a controlled substance. Smith also declined to place the children with their paternal grandmother because Smith suspected that Father was living with her. Smith contacted Father for placement suggestions, but he never responded.

In November 2007, Paula Rietz, a Program Director at CPS, received a referral that the children may have been physically abused and neglected. She then discovered that the children were not residing with their adult sister as

2

designated by the safety plan. The children were instead residing with a woman not named in the safety plan, whom CPS determined to be an unsuitable caregiver. Rietz communicated with Father during the removal process but excluded him as a placement option because he refused to take a drug test. In her last efforts to avoid removal, Rietz asked Father and T.A. for additional family members that might be able to keep the children. Father gave Rietz his sister's name, but Rietz was unable to locate her, and T.A. did not provide Rietz with any names.

While T.A. admitted to having a drug problem, Father denied having any substance abuse problems of his own. Father began using heroin (his primary drug of choice) at age eighteen, and he admitted to using it as recently as June 2009. Father also admitted to using cocaine (his secondary drug of choice) in December 2007 and May 2008. Even though Father insisted that he did not have a drug problem, CPS caseworker Abigail Flores suggested that Father take a drug assessment and follow its recommendations, namely drug rehabilitation treatment.

In June 2008, Father received detox treatment at the Billy Gregory facility. His treatment included doses of Suboxone, prescribed for heroin withdrawal symptoms. Father then moved to the Pine Street facility for an inpatient drug rehabilitation program. Father's patient records indicated that he used heroin for thirty-nine years and used heroin three to six times per week for the six months prior to his admission to Pine Street. Father's discharge summary, dated

September 2008, stated that "client is chemically dependent on heroin, gets easily frustrated when he fails to get his way and he lacks appropriate coping skills." As part of his relapse prevention plan, Father wrote down alternative activities to mood-altering drugs and noted that heroin would kill him and prevent him from being reunited with his two children.

Father testified at T.A.'s termination trial in September 2008 that he would never use drugs again. But since then, Father has never tested negative for drugs. Shortly after the September 2008 trial, Father tested positive for cocaine and heroin in December 2008.

In January 2009, the trial court signed an order that set forth tasks that Father agreed to perform in order to have his children returned. These tasks included submitting to random drug testing. Six days after the court signed the order, Father admitted cocaine use, and on January 13, he tested positive for cocaine.

From February 2009 through December 2009, Father failed to attend four separately scheduled drug tests after Flores personally told him to do so. In May 2009, November 2009, and August 2010, Father arrived at the testing facility but was unable to provide a testable sample. After struggling to obtain a urine sample from Father, CPS decided to take samples of Father's hair. However, this alternative method failed because Father had no hair.[2]

---

[2]Father told CPS workers that he had no hair because he was Native American. However, Father identified himself as African-American and not

4

In January 2010, Father admitted to using cocaine and opiates and tested positive for cocaine. In April 2010, Father tested positive for cocaine, codeine, morphine, and heroin. In August 2010, Father was present for a random drug test, but he refused an oral swab.

The tasks that Father was required to perform in order to regain custody of his children also included paying $270 per month in child support. Father owed a balance of $6,493.50 at the time of trial in December 2010. Father, however, claims to have made the first two payments. He attributes his failure to make further payments to his unemployment.

Although Father testified in the 2008 trial that at that time he worked at least forty hours per week, he never provided proof of employment, despite repeated requests from caseworkers. Father told Flores that he unloaded trucks in Wichita Falls, but he never provided her with a pay stub, a phone number, or even his employer's name.

Father testified that he sustained a back, neck, and nerve injury in April 2009 that prevented him from working until the Fall of 2010. During the couple of months before trial, during which Father was able to work, he did not go to any specific employers or to the Texas Workforce Commission to find work. Father testified that he went to a church that builds HUD homes and that he planned to file for his own disability and Social Security from his late wife.

American Indian or Alaskan native when registering to receive treatment at MHMR. Father had hair at the time of trial.

The trial court's 2009 temporary order further provided that Father complete parenting classes. Father completed forty-two hours of parenting classes before the 2008 trial, but he did not complete any parenting classes after the 2009 order. Father testified that one set of classes was sufficient.

In response to Father's failure to comply with the court order, among other acts or omissions, TDFPS petitioned the trial court in January 2010 to terminate his parental rights. The trial court terminated Father's parental rights in December 2010. This appeal followed.

## III. BURDEN OF PROOF AND STANDARD OF REVIEW

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20–21 (Tex. 1985); *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (West Supp. 2010); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a) (West 2008). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve

7

any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.* We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573–74.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated the relevant conduct provisions of section 161.001(1) and that the termination of the parent-child relationship is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## IV. EVIDENTIARY SUFFICIENCY—ENDANGERMENT

In his first issue, Father argues that the evidence is both legally and factually insufficient to support the trial court's family code section 161.001(1)(D) and (E) endangerment findings.

Endangerment means to expose to loss or injury, to jeopardize. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child. Tex. Fam. Code Ann. § 161.001(1)(D). Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. *In re D.T.*, 34 S.W.3d 625, 632 (Tex. App.—Fort Worth 2000, pet. denied). A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards. *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under section 161.001(1)(D). *Id.* Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *J.T.G.*, 121 S.W.3d at 125.

The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the physical or emotional well-being of the child. Tex. Fam. Code Ann. § 161.001(1)(E). Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. *J.T.G.*, 121 S.W.3d at 125. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *Id.*; *D.T.*, 34 S.W.3d at 634.

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied). To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, and the child is not required to suffer injury. *Boyd*, 727 S.W.2d at 533. The specific danger to the child's well-being may be inferred from parental misconduct alone, and to determine whether termination is necessary, courts may look to parental conduct both before and after the child's birth. *Id.*; *In re D.M.*, 58 S.W.3d 801, 812–13 (Tex. App.—Fort Worth 2001, no pet.). A factfinder may also infer from past conduct endangering the well-being of the child that similar conduct will recur if the child is returned to the parent.

10

*See In re D.L.N.*, 958 S.W.2d 934, 941 (Tex. App.—Waco 1997, pet. denied), disapproved on other grounds by *J.F.C.*, 96 S.W.3d at 256, and *C.H.*, 89 S.W.3d at 17. A parent's engaging in illegal drug activity after agreeing not to do so in a service plan for reunification with his children is sufficient to establish clear and convincing proof of voluntary, deliberate, and conscious conduct that endangered the well-being of his children. *In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.).

Because the evidence pertaining to subsections 161.001(1)(D) and (E) is interrelated, we conduct a consolidated review.[3] *See In re T.N.S.*, 230 S.W.3d 434, 439 (Tex. App.—San Antonio 2007, no pet.); *J.T.G.*, 121 S.W.3d at 126. While Flores testified that she was concerned about Father's stability because of his inability to maintain employment, she stated that her primary concerns were his cocaine and heroin use and his inability to provide a safe environment for the children.

---

[3]Although the trial court previously denied TDFPS's petition to terminate Father's rights, the family code allows us to consider evidence presented in favor of termination that was admitted at a previous hearing. *See In re D.S.*, 333 S.W.3d 379, 386 (Tex. App.—Amarillo 2011, no pet.); *see also* Tex. Fam. Code Ann. § 161.004(b) (West 2008). TDFPS alleged in its first amended petition for termination in suit affecting the parent-children relationship "that the circumstances of the child, sole managing conservator, or other party affected by the order denying termination on December 17, 2008, have materially and substantially changed since the date that order was rendered" and "that [Father] has committed an act listed under Section 161.001 of the Texas Family Code before December 17, 2008." Father did not challenge either of these allegations at trial, and he does not argue in his brief that the trial court could not consider evidence of his conduct before the 2008 denial of termination.

Father was convicted of aggravated possession of a controlled substance in the late 1980s, for which he served time in prison. There is evidence that Father used heroin and cocaine for over half of his life. Although Father completed drug treatment in 2008, he admitted to using heroin in June 2009. During TDFPS's involvement with Father, he never provided proof of employment or tested negative for drugs.

Father argues that many of his positive drug tests actually resulted from his failure to appear for drug tests and from an inability of the testing site to obtain a testable sample. But the evidence indicates that Father tested positive for illegal substances four times after the children were removed in November 2007. Although Father attended drug rehabilitation in 2008 after his first three positive drug tests, he admitted to relapsing and using heroin again in June 2009. Father testified that two of the 2010 drug tests were inaccurate, but he provided no reason for their alleged inaccuracy.[4] The trial court was the sole judge of Father's credibility, and his positive drug tests were evidence that he engaged in conduct that endangered his children's well-being. *See T.N.*, 180 S.W.3d at 383.

Furthermore, the evidence indicates that Father failed to attend five scheduled drug tests. Although Father testified that he attended four of the tests that Flores said he had missed, he offered no explanation for why the tests were

---

[4]Father did not challenge the three positive drug tests obtained prior to June 2009.

not recorded or performed.[5]  In judging the credibility of the witnesses, the trial court could have reasonably inferred from Father's failure to attend drug screenings that he avoided the tests because he was using drugs.  *See In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.); *see also J.P.B.*, 180 S.W.3d at 574.

Finally, there is evidence that Father was responsible for the testing site's occasional inability to obtain a testable sample.  After CPS struggled to collect Father's urine sample, it decided to test Father's hair.  However, a testable hair sample was unobtainable because Father had no hair.  While Father told CPS workers that he had no hair because he was Native American, he had previously indicated on MHMR records that he was African-American.  The trial court could have interpreted Father's repeated drug test refusals and his lack of hair at testing times but having hair at trial as an indication that he was using illegal drugs after the children's removal, which is evidence demonstrating endangerment.  *See Cervantes-Peterson v. Tex. Dep't. of Family & Protective Services*, 221 S.W.3d 244, 253–54 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

Father argues that CPS is at fault for not clearly indicating its expectations for his continued drug treatment and for not seeking to provide him with further

---

[5]Father did state that his failure to perform one of the tests resulted from his daughter, who had given him a ride, needing to leave and thus shortening his visit.

drug treatment after his post-rehab positive drug tests. However, the focus of this issue is whether Father's conduct endangered the children, not the reasons why he engaged in such conduct or what CPS could have done differently. *Cf. In re R.F.*, 115 S.W.3d 804, 810 (Tex. App.—Dallas 2003, no pet.) (noting that mother's continuing course of destructive behavior that endangered her children may be attributed to, but could not be excused by, her sexual and physical abuse as a child and acknowledging that CPS could have handled her case as a child differently, but stating that mother did little to help herself). Also, Father admitted at trial that he had written in his relapse prevention plan that using heroin again could kill him and could also prevent him from achieving his goals of reunification with his children. Furthermore, Flores testified that Father's original service plan (which included drug treatment) never expired, that he understood that he must abide by it, and that CPS provided him with access to programs that could assist him with his drug problem.

Father also argues that "there was no evidence that [he] ever directly or indirectly performed any act or omission that would constitute endangerment as to the children." He contends that the children did not reside with him and that there is no evidence that he had used drugs while in the possession of the children or that the children were ever neglected or abused as a result of any drug use. To support a finding of endangerment, however, Father's conduct did not necessarily have to be directed at the children, and the children were not required to suffer injury. *See Boyd*, 727 S.W.2d at 533. Father's heroin and

14

cocaine use after TDFPS removed the children is sufficient to constitute endangerment.  *See Cervantes-Peterson*, 221 S.W.3d at 253–54.

Furthermore, although Father did not live with T.A. when C.H.H. Jr. was born, Father testified that he visited the children at her house almost every day and that he was vaguely aware of T.A.'s drug use.[6]  Thus, the trial court could have considered Father's failure to take action to protect his children from T.A.'s drug abuse as sufficient evidence to establish that he knowingly allowed the children to remain in conditions or surroundings that endangered their well-being.  *See Edwards v. TDPRS*, 946 S.W.2d 130, 138 (Tex. App.—El Paso 1997), *overruled on other grounds*, *J.F.C.*, 96 S.W.3d at 267 n.39.

Likewise, the trial court could have reasonably concluded that Father's prior drug conviction, his continued drug use, and his failure to maintain employment established a course of conduct that endangered the well-being of the children.  *See In re R.W.*, 129 S.W.3d 732, 743 (Tex. App.—Fort Worth 2004, no pet.) (noting that imprisonment alone is insufficient to show a continuing course of conduct that endangers the physical or emotional well-being of a child, but when considered in conjunction with evidence of substance abuse, mental instability, and sexual misconduct, such evidence provides further proof of conduct that endangered child's well-being).

---

[6]Both children tested positive for cocaine at birth.  T.A. admitted to using drugs during pregnancy and to having a drug problem.

Accordingly, giving due deference to the trial court's findings, we hold that the trial court could have formed a firm belief or conviction that Father engaged in conduct or knowingly placed or knowingly allowed the children to remain in conditions that endangered their physical or emotional well-being. *See* Tex. Fam. Code. Ann. § 161.001(1)(D), (E). We hold that the evidence is legally and factually sufficient to support the trial court's family code section 161.001(1)(D) and (E) findings, and we overrule Father's first issue. Having overruled this issue, we need not address—and therefore overrule—his second issue challenging the legal and factual sufficiency of the evidence to support the trial court's section 161.001(1)(O) finding. *See* Tex. R. App. P. 47.1; *J.L.*, 163 S.W.3d at 84 (stating that parent must have committed only one of the acts prohibited under family code section 161.001(1) for termination of her parental rights).

## V. EVIDENTIARY SUFFICIENCY—BEST INTEREST

In his third issue, Father argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of the parent-child relationship between Father and the children is in the children's best interest. He contends that TDFPS did not overcome the strong presumption that the best interest of the child is served by keeping the child with the parent. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

While we strongly presume that keeping a child with a parent is in the child's best interest, we also presume that prompt and permanent placement of

16

the child in a safe environment is in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008) (listing factors that should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment). In a termination case, the trier of fact may use the following nonexclusive factors in determining the best interest of the child: (A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive: some may be inapplicable, and additional factors may be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.* The same evidence of acts or omissions used to establish grounds for termination under section 161.001(1) may be probative in determining the best interest of the child. *Id.* at 28.

17

## A.    The Desire of the Child

While the children are very young and have not explicitly expressed their desires, Flores testified that the children share a close bond with their foster parents, with whom they have been living for three years.  Flores also testified that the children call Father "Daddy" during their visits with him; and Father testified that C.H.H. Jr. "runs through the lobby hollering Daddy at the CPS office" when he arrives for a visit.

## B.    The Emotional and Physical Needs of the Children Now and in the Future

Flores testified that C.S.L.E.H. is confused by the fact that she has a mommy and daddy at home and another dad somewhere else.  Flores also stated that a court's final decision would help give the children a permanent home and provide needed closure for the children.  She said that the back-and-forth visits interfere with the children's schooling.

The children's foster mother testified that she builds trust and a bond with C.S.L.E.H. when the two participate in Momma-[Daughter] Day.  The foster mother said that she talks to and listens to C.S.L.E.H. and that C.H.H. Jr. refers to her as "Mommy" and refers to her husband as "Daddy."

## C.    The Emotional and Physical Danger to the Children Now and in the Future

The record contains evidence that Father has been using illegal substances and that refusing to acknowledge his drug use is problematic for the children.  Flores testified that Father's positive drug tests after drug rehabilitation

18

indicate that he failed to internalize the tools that he learned in rehab and that his continued denial of his drug problem will prevent the effectiveness of rehab in the future. Father testified that he used heroin in June 2009 despite knowing that it threatened his ability to get his kids back. Flores testified that the children should not have to wait any longer for their Father to prove his sobriety and stability and that his current drug use threatens their safety because of the probability that the children may access his drugs.

### D. The Parental Abilities of the Individuals Seeking Custody

Father completed parenting classes in 2008, and Flores testified that Father acted appropriately on his visits with the children. Father testified that he has only missed two visits since the children's removal. Father stated that he reads books and plays games with the kids and that he has a good relationship with the oldest child. He said that she opens up to him about her life. Father further testified that he raised a family for thirty years with his late wife and her three children.

But the evidence also indicates that Father has never provided proof of employment, has never sustained a negative drug test, and his drug use impairs his judgment and, therefore, his ability to care for the children.

The foster mother testified that she wants to adopt the children. She and her husband are both educators and, according to the foster mother, they engage in educational activities with the children at their home. The foster mother is in the process of completing a Ph.D., and her husband has a Master's

19

degree. The foster mother also testified that she has the children involved in many extracurricular activities, including sports and music. She further stated that she has taken the children on trips to the Atlantic Ocean and the Kennedy Space Center.

**E.      The Programs Available to Assist Father and the Foster Parents to Promote the Best Interests of the Children**

Father testified that he would go into drug treatment if it meant getting his children. However, Flores questioned whether treatment would be effective for Father because he continued to deny that he has a drug problem. Father also testified that despite the fact that he used drugs after attending a parenting class in 2008, he believed that one set of classes was sufficient.

Flores testified that if the foster parents are able to adopt the children, then the children's medical needs and state college tuition will be secured.

**F.      The Plans for the Children by the Foster Parents and Father**

The foster mother testified that her vision for the next decade includes taking the children on vacation once a year, maintaining their college funds, and teaching them how to save money and be productive members of society. The foster mother said that she would do everything required of her to achieve permanency through adoption as quickly as possible. According to Flores, the current restrictions on foster parents prevent them from fulfilling the children's best interests. Flores also testified that Father has never provided TDFPS with a child care plan to put in place if the children were returned to him.

20

### G. The Stability of the Home or Proposed Placement

The foster parents are both elementary school teachers. Father, on the other hand, testified that he has not had a steady job in a year and a half, and his testimony indicates that he has taken minimal efforts to obtain employment.[7] Flores testified that her concerns over Father's stability were addressed by requiring Father to make regular child support payments. However, the evidence indicates that he failed to make payments from February 2009 through December 2010 and that he owes over $6,000 in child support. Flores also testified that Father's drug use exposes him to possible incarceration and that there is no stability if Father is in and out of jail. She further stated that Father has had plenty of opportunity to prove his stability and sobriety but has failed to do so.

### H. Father's Acts or Omissions Which May Indicate That the Existing Parent-Child Relationship Is Improper

The evidence indicates that Father knew that T.A. was using drugs while she was the primary caretaker of his children. The evidence also indicates that Father had opportunities to address T.A.'s drug use and its effects on the children because Father testified that he lived down the street from the children and visited them at T.A.'s home almost every day before TDFPS removed the

---

[7]Father testified that has *not* gone to any specific employers or the Texas Workforce Commission to look for a job. He said only that he has been looking for a job in different places and plans to file for disability.

children in 2007. Furthermore, Rietz testified that Father had been involved with T.A. for a number of years and practically lived next-door to her.

Father argues that the record does not contain evidence that he committed an act or omission toward or around the children that would indicate the parent-child relationship is not proper. However, the record is also flooded with evidence of his illegal drug use as discussed in the above analysis. Furthermore, Father has failed to pay child support as he promised to do when he signed the "Agreed Order for Actions Necessary for Parent to Obtain Return of Child" in 2009.

## I.    Father's Excuse for His Acts or Omissions

Father argues that his failure to pay child support is excused by his inability to work for a significant amount of time due to an accidental injury. However, the record does not indicate any excuses for why Father did not contact specific employers or the Texas Workforce Commission for the two or three months that he was able to work before trial.

Father also argues that his wife's death "creat[ed] a reasonable assumption that some of the family support resources that would have been otherwise available to [Father] were lost" because "his wife was willing to assist him in taking" in the children. However, Father testified at trial that his wife died three years ago and that someone else notified him to file for Social Security and disability, but Father did not indicate that he has done so.

22

Lastly, Father seems to argue that his drug use is excused by TDFPS's failure to "clearly convey to [him] that there was an expectation that [he] would need to complete additional drug treatment following the first termination trial in 2008." However, Father testified that he has never had a drug problem and that he used drugs in June 2009 despite knowing that it would threaten his ability to get his kids back. Furthermore, Flores testified that Father's original service plan never expired and that he understood that he was obligated to continue following CPS's expectations under the original service plan.

Considering the relevant statutory factors in evaluating Father's willingness and ability to provide the children with a safe environment and the relevant *Holley* factors, we hold that, in light of the entire record, and giving due consideration to evidence that the trial court could have reasonably found to be clear and convincing, the trial court could reasonably have formed a firm belief or conviction that termination of Father's parental rights to C.S.L.E.H. and C.H.H. Jr. is in the children's best interests. Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's family code section 161.001(2) best interest findings. We overrule Father's third issue.

## VI. CONCLUSION

Having overruled all of Father's dispositive issues, we affirm the trial court's order terminating Father's parental rights to C.S.L.E.H. and C.H.H. Jr.

BILL MEIER
JUSTICE

PANEL:  GARDNER, WALKER, and MEIER, JJ.

DELIVERED:  August 25, 2011